James Houston BOWMAN et al.,
Plaintiffs,

State of Arizona, Intervenor,

v.

Stewart L. UDALL et al., Defendants.

San Carlos Apache Tribe of Indians,
Intervenor.

Civ. A. No. 105-63.

United States District Court
District of Columbia.

June 16, 1965.

Ozell M. Trask, Phoenix, Ariz., for plaintiffs.

Dale R. Shumway, Sp. Asst. Atty. Gen. of Arizona, for intervenor plaintiffs.

Floyd M. France, Atty., Dept. of Justice, for defendants.

Arthur Lazarus, Jr., Washington, D. C., for intervenor defendants.

TAMM, District Judge (by designation).

This case involves the question of whether the Secretary of the Interior has the authority to restore the subsurface of certain lands in the State of Arizona to the San Carlos Apache Tribe of Indians. The land involved constitutes that tract hereinafter designated as the Mineral Strip.

By Order No. 2874 (28 Fed.Reg. 4608), former Under Secretary of the Interior James K. Carr restored these subsurface lands to the Indians "subject to any valid existing rights" and exclusive of "any patented lands or any interest in any patented lands. * * * "

Plaintiffs, who own patented lands and also possess surface grazing permits and leases in the area, and the State of Arizona, which claims valid existing rights in the area under grants from the United States, are together attempting in this action to have Order No. 2874 declared illegal.

Defendants and the Tribe assert in response (1) that plaintiffs and the State of Arizona have no standing to sue in view of the protection given by the restoration order to patented lands and other valid existing rights, and (2) that the Secretary of Interior's action is authorized under sections 3 and 7 of the Indian Reorganization Act of June 18, 1934, 48 Stat. 984, 986, 25 U.S.C. §§ 463, 467.

The background of this litigation is as follows:

The San Carlos Indian Reservation in Arizona was created by Executive Order dated December 14, 1872. Numerous Executive Orders, Agreements with the Indians, and Congressional Acts from 1872 to 1902 effected changes in the boundaries of the reservation by exclusions from and an addition to the land contained therein, including the Agreement of February 25, 1896, ratified by the Act of June 10, 1896, ch. 398, 29 Stat. 321, 358, covering the lands here involved.

By Article I of the 1896 Agreement, the Indians of the San Carlos Reservation did "cede, grant, and relinquish to the United States all right, title, and claim which they may have in and to all the land" within a portion of the San Carlos Reservation known as the "Mineral Strip," which contains approximately 232,000 acres. By Article II of this agreement, the United States stipulated and agreed "to place in the Treasury of the United States to the credit and for the sole benefit of the said Apache, Mohave, and Yuma Indians * * the net proceeds accruing from the disposal of such coal and mineral lands." In approving the agreement, Congress expressly provided in the Act of June 10, 1896, that "the lands so surrendered shall be open to occupation, location, and purchase under the provisions of the mineral-land laws only."

From 1896 until 1931, while all lands within the San Carlos Mineral Strip were subject to disposition under the mineral land laws, the Tribe received from such entries net revenue amounting to only $12,433. In view of the insignificant financial returns to the Indians under the 1896 agreement, the First Assistant Secretary of the Interior, on March 30, 1931, withdrew the lands in the Mineral Strip from all forms of entry or disposal under the public land laws, subject to all valid rights and claims, pending the enactment of legislation sanctioning the restoration of the area to the Tribe. The 1931 withdrawal remains in effect today.

On June 18, 1934, Congress passed the Indian Reorganization Act (also known as the Wheeler-Howard Act), 48 Stat. 984, 25 U.S.C. § 463 et seq. Section 3 of the Act authorizes the Secretary of the Interior under certain conditions to restore to tribal ownership "remaining surplus lands" which were formerly part of any Indian reservation but which had been open to disposal by the United States under any of its public-land laws. Section 7 authorizes the Secretary to proclaim new Indian reservations or to

add lands acquired in accordance with the statute to existing reservations. Less than sixty days after approval of the Indian Reorganization Act, the Commissioner of Indian Affairs recommended, and a month later Secretary of the Interior Ickes directed, that all undisposed of lands of a number of Indian reservations

"* * * be temporarily withdrawn from disposal of any kind, subject to any and all existing valid rights, until the matter of their permanent restoration to tribal ownership, as authorized by section 3 of the Act of June 18, 1934, supra can be given appropriate consideration. The intention is to withdraw only lands the proceeds of which, if sold, would be deposited in the Treasury of the United States for the benefit of the Indians."   51 I.D. 559, 563.

The San Carlos Mineral Strip, ceded by the agreement of February 25, 1896, is the first tract listed in the Secretary's 1934 withdrawal order, 54 I.D. at 561, and that withdrawal remains in force today.

On June 28, 1934, Congress also passed the Taylor Grazing Act, 48 Stat. 1269, 43 U.S.C. § 315 et seq., providing for the administration of grazing resources on lands of the United States, and on February 14, 1936, Arizona Grazing District No. 4 was established under authority contained in that Act.   Grazing District No. 4 includes a substantial area of undisposed of lands within the Mineral Strip.   On November 17, 1936, the Assistant Commissioner of Indian Affairs and the Acting Director of Grazing addressed a letter to the Secretary of the Interior concerning these undisposed of lands, which letter recites in part:

"Since these lands are within the exterior boundary of Arizona Grazing District No. 4, established February 14, 1936, it is hereby agreed that they be placed temporarily under range management in accordance with the provision of the Taylor Grazing Act, until final disposition

has been made thereof, provided that any action taken to place these lands under range management shall be consistent with any prior valid withdrawal from entry, and that the right, title, and interest of the Indians in and to these lands shall in no way be jeopardized."

This letter was approved November 25, 1936, by the Assistant Secretary of the Interior.

A substantial portion of the Mineral Strip remained undisposed of and not included within Grazing District No. 4. In order to clarify the administration of such lands, as well as the lands in Grazing District No. 4, the Assistant Commissioner of Indian Affairs, the Commissioner of the General Land Office (now the Bureau of Land Management) and the Director of Grazing, in 1941, signed a memorandum to the Secretary of the Interior which contained an agreement among these parties that the ceded lands which did not lie within an established grazing district would be temporarily administered under lease by the General Land Office, pursuant to the condition set forth in the above letter of November 17, 1936.   This memorandum was approved by the First Assistant Secretary of the Interior on June 21, 1941.

Thus, the grazing resources of all undisposed of lands in the Mineral Strip are now administered by the Bureau of Land Management under the terms of the Taylor Grazing Act and on condition that the right, title and interest of the Indians therein shall not be jeopardized. The San Carlos Apache Tribe actually receives income from the Taylor Grazing Act leases within the Mineral Strip.

Plaintiffs or their predecessors for many years have engaged in the business of ranching on the Mineral Strip.   The plaintiffs, or some of them, hold permits to graze livestock within that portion of the Mineral Strip included in Grazing District No. 4, and some of the plaintiffs hold leases to graze livestock on lands within that portion of the Mineral Strip outside of the grazing district.   In ad-

dition, the plaintiffs claim title to lands within the Mineral Strip under patents from the United States, and the State of Arizona claims title to numerous tracts under grants made in its Enabling Act. Furthermore, it is established that the plaintiffs have made valuable improvements upon the lands they claim, as well as the lands they use under Taylor Grazing Act leases or permits.

On March 11, 1958, the San Carlos Apache Tribal Council adopted Resolution No. 58–7 requesting the Secretary of the Interior to restore both the surface and subsurface of the lands within the Mineral Strip to tribal ownership. As a result of the Tribe's request, the Secretary held a hearing in February 1960, at Globe, Arizona, at which the plaintiffs appeared and opposed the restoration. No report or findings were ever made as a result of the hearing.

On December 10, 1962, Secretary Udall stated in a letter that he had referred the matter of the application in Resolution 58–7 to Under Secretary James K. Carr and that a decision would be made before January 1, 1963. On or about January 10, 1963, the plaintiffs filed this action seeking to enjoin defendants from acting upon Resolution No. 58–7 or from restoring any lands in the Mineral Strip to tribal ownership.

On April 2, 1963, and still before the Secretary had acted on the Tribe's application one way or another, the San Carlos Tribal Council adopted Resolution No. 63–17 requesting the Secretary "immediately to restore to tribal ownership, subject to any valid existing rights, the subsurface interests in the lands that were ceded to the United States by the Agreement of February 25, 1896," and further resolving "that the Tribe's petition for restoration of the surface of the Mineral Strip be withdrawn from consideration and held in abeyance by the Secretary until reactivated by the San Carlos Council." Upon being informed that Under Secretary Carr proposed to take immediate action on this Resolution, the plaintiffs moved in this Court for a temporary restraining order.

After a hearing, Judge Pine on June 17, 1963, issued a temporary restraining order as to patented lands, but denied the same as to unpatented lands within the Mineral Strip. Later the same day, the Under Secretary issued Order No. 2874, supra, subject to the limitation of the Court's restraining order.

The restoration order indicated that the public hearings held in February, 1960 had been considered, and it concluded as follows:

"Section 1. Now, Therefore, by virtue of the authority vested in the Secretary of the Interior by sections 3 and 7 of the act of June 18, 1934 (48 Stat. 984), I hereby find that restoration to the San Carlos Apache Indian Tribe of the mineral, oil and gas resources in all of the following described lands will be in the public interest, and the right, title and interest in and to all minerals, oil and gas resources in said lands are hereby restored to tribal ownership for the use and benefit of the San Carlos Apache Tribe of Indians, and are added to and made a part of the existing reservation, *subject to any valid existing rights. \* \* \* This order shall not apply to any patented lands or any interest in any patented lands (including subsurface interests in such lands) located within the Mineral Strip.*" (Emphasis added).

Order No. 2874 provided that it would become effective upon agreement by the San Carlos Apache Tribe that mining operations within the portion of the Mineral Strip included in the Coronado National Forest be subject to supervision in certain respects by the Secretary of Agriculture. The San Carlos Tribal Council adopted such a resolution on July 9, 1963, and the restoration order became effective as of that date. The Tribe's request for restoration of surface rights in the Mineral Strip has not been reactivated by the Council and no longer is under active consideration by the Secretary of the Interior.

On July 24, 1963, plaintiffs filed an amended and supplemental complaint setting forth, in addition to the allegations of the original complaint, facts which occurred after its filing, but still seeking to enjoin the restoration to tribal ownership of surface as well as subsurface interests in the Mineral Strip. On July 30, 1963, plaintiffs moved for a preliminary injunction, and on August 13, 1963 defendants filed a motion for summary judgment. After a hearing, Judge Holtzoff, on September 13, 1963, denied the motion for summary judgment. On the same day, he granted a preliminary injunction limited to the patented lands and denied the preliminary injunction as to all undisposed of lands, thus, in effect, continuing the temporary restraining order which had been issued by Judge Pine.

The Court granted a motion by the State of Arizona to intervene as a party plaintiff on September 11, 1963; a motion by the San Carlos Apache Tribe of Indians to intervene as a party defendant was similarly granted on April 13, 1964. James K. Carr resigned his position as Under Secretary of the Interior effective July 15, 1964. A pretrial conference was held on October 1, 1964, which resulted in an agreed pretrial statement of the facts, the essence of which is set forth above. Trial was held on the case before this Court on March 8–9, 1965.

The issues which are presented to the Court by these circumstances are:

(1) Whether there exists a case or controversy between the plaintiffs, including the State of Arizona, and the defendants, and whether the plaintiffs and the State of Arizona have standing to maintain an action challenging the authority of the Secretary of the Interior to restore to tribal ownership for the use and benefit of the San Carlos Apache Tribe of Indians the subsurface of the San Carlos Mineral Strip, and

(2) Whether the Secretary of the Interior is authorized under sections 3 and 7 of the Indian Reorganization Act to restore to tribal ownership for the use and benefit of the San Carlos Apache Tribe the subsurface of lands ceded by the Indians to the United States under an agreement dated February 25, 1896, as ratified by the Act of June 10, 1896.

I.

■ With respect to the first issue, it is contended by the plaintiffs that Judge Holtzoff's conclusion in granting the preliminary injunction on September 13, 1963 that the "[p]laintiffs have standing to maintain this action" is binding upon this Court as the "law of the case." The Court, however, is unable to accept such a contention, Messinger v. Anderson, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1159 (1912); Dictograph Products Co. v. Sonotone Co., 230 F.2d 131, 135–36 (2d Cir. 1956), cert. dismissed 352 U.S. 883, 77 S.Ct. 104, 1 L.Ed.2d 82 (1956); Bowles v. Wilke, 175 F.2d 35, 37 (7th Cir. 1949), cert. denied 338 U.S. 861, 70 S.Ct. 104, 94 L.Ed. 528 (1949), particularly where, as here, the Court has had the benefit of a full trial in which evidence was introduced on this issue, and defendant's argument affects the jurisdiction of the Court which ordinarily cannot be waived. See Puritan Church of America v. United States, 191 F.Supp. 670, 671 (D.D.C.1961), aff'd 111 U.S. App.D.C. 105, 294 F.2d 734 (1961). Hence, neither the defendant nor the trial court is precluded by a prior ruling on a motion for a preliminary injunction from reconsidering the questions previously raised. Farmer v. Roundtree, 252 F.2d 490, 491 (6th Cir. 1958), cert. denied 357 U.S. 906, 78 S.Ct. 1158, 2 L.Ed. 2d 1156 (1958); Van Voorhis v. District of Columbia, 240 F.Supp. 822, Civil Action No. 2973–61, D.D.C. (Memorandum opinion of April 19, 1965, reproduced in part in 93 Daily Wash.L.R. 871 (May 24, 1965).

■ Turning to the merits of this issue, the Court holds with respect to both the plaintiffs and the State of Arizona that there presently exists no case or controversy between these plaintiffs and the Secretary of the Interior over the validity of the Secretary's authority to restore to tribal ownership the surface rights in

the Mineral Strip and that the plaintiffs have failed to establish a legally recognizable injury as a result of the Secretary's action in restoring the subsurface rights which would afford them standing to maintain this action.

The restoration order returns to the San Carlos Indians ownership only in the subsurface mineral rights in the Mineral Strip. It was not in any way intended to affect the rights to the surface of those lands. In addition, the order is expressly made "subject to any valid existing rights," and specifically does "not apply to any patented lands or any interest in any patented lands (including subsurface interests in such lands) located within the Mineral Strip."

Those of the individual plaintiffs who have patents or interests in patents are not affected by this order, which clearly protects their property rights. However, it is equally as clear that the grazing leases and permits held by some of the individual plaintiffs in the Mineral Strip do not vest in these plaintiffs any interest in or right to prospect for or to mine the minerals underlying the lands covered by those leases or permits. Since the Secretary of the Interior has taken no affirmative action whatsoever with respect to the surface rights of the Mineral Strip, these plaintiffs can claim no injury to any legally protected property right or interest they possess.

■ In fact, the plaintiffs' permits and leases under sections 3 and 15 of the Taylor Grazing Act, 43 U.S.C. 315b and 315m respectively, confer upon the plaintiffs a mere privilege to graze livestock—a privilege which can be withdrawn by the United States without payment or compensation. Osborne v. United States, 145 F.2d 892, 896 (9th Cir. 1944); United States v. Cox, 190 F.2d 293, 296 (10th Cir. 1951), cert. denied 342 U.S. 867, 72 S.Ct. 107, 96 L.Ed. 652 (1951). These permits and leases are precluded under the statute and applicable regulations from restricting in any way the development of mineral resources in the lands involved. 43 U.S.C. § 315e and 43 C.F.R. 4122.5–1. Moreover, these lands within the Mineral Strip included both in and outside of Grazing District 4 are administered for grazing purposes under the condition "that the right, title, and interest of the Indians in and to these lands shall in no way be jeopardized."

Therefore, the conclusion is inescapable that these individual plaintiffs lack standing to sue to enjoin the Secretary from restoring the subsurface rights in the lands of the Mineral Strip to the San Carlos Apache Indians.

■ At the trial, the plaintiffs introduced two witnesses who owned ranching businesses operating in the Mineral Strip. The essence of their testimony was that in their own personal opinions the value of their leases, permits and improvements on the land was reduced some 60% as a result of the request of the Indians for restoration of the lands within the Mineral Strip and the hearings held by the Secretary of the Interior to determine whether such a restoration would be in the public interest. They did not testify, however, that the 60% figure was deduced from the results of advertisements or listings for sale with a broker of their grazing rights or property, or was even attributable to any offers at such reduced prices. The Court must conclude, therefore, that the witnesses were engaging in pure speculation unsupported by any relevant facts as to value of their property and based primarily, if not entirely, on fear on their part that the Secretary would restore the surface rights to the land to the Indians. Such a fanciful fear of loss attributable to governmental action, which is not even threatened let alone accomplished, is in the nature of *damnum absque injuria,* and does not create standing to sue to contest other governmental action, however illegal, in the parties claiming such spurious injury. Texas State AFL–CIO v. Kennedy, 117 U.S.App.D.C. 343, 330 F.2d 217, 219 (1964), cert. denied 379 U.S. 826, 85 S.Ct. 54, 13 L.Ed.2d 36 (1964); Kansas City Power & Light Co. v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924, 928 (1955), cert. denied 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955).

■ The facts also reveal that there presently exists no case or controversy between the parties over whether the Secretary of the Interior has the authority to restore the surface rights in the Mineral Strip to the Tribe. As indicated, Resolution 63–17 adopted by the San Carlos Tribal Council on April 2, 1963, resolved "that the Tribe's petition for restoration of the surface of the Mineral Strip be withdrawn from consideration and held in abeyance by the Secretary until reactivated by the San Carlos Council." Order No. 2874 was limited to the restoration of subsurface interests in the Mineral Strip to the Indians. The Tribe has not reactivated its request for surface restoration, and it has been represented to the Court that such a request is not at present pending before the San Carlos Tribal Council. Moreover, it was stipulated by the parties in the pretrial statement that the Secretary no longer has Tribal Resolution No. 58–7 under active consideration.

Plaintiffs assert in essence that the Tribe could at any time reactivate its request for surface rights and the Secretary could restore them. However, such a theoretical possibility that the Secretary might so act appears to the Court too conjectural to create a case or controversy over which the Court has jurisdiction. Alaska Airlines, Inc. v. Pan American World Airways, 116 U.S.App. D.C. 128, 321 F.2d 394 (1963); Brandenfels v. Day, 114 U.S.App.D.C. 374, 316 F.2d 375, 378 (1963). It is pointed out that even should the Tribe resolve to seek the surface rights, the Secretary of the Interior is the only person vested with the authority under the Indian Reorganization Act to restore the former Indian lands to tribal ownership, and he may do so only upon a finding that such a restoration in a given instance would be in the "public interest."

■ Finally, the plaintiffs contend that the fact that the Solicitor for the Department of the Interior in 1962 expressed the opinion that "the Secretary has the discretionary power to return the remaining undisposed of portions of the Mineral Strip to the San Carlos Tribe" creates a justiciable controversy. The short answer to this allegation is that "[t]he abstract assertion of jurisdiction by an agency is not ordinarily a basis for judicial review." California Oregon Power Co. v. Federal Power Commission, 99 U.S.App.D.C. 263, 267, 239 F.2d 426, 430 (1956).

With respect to the State of Arizona, it is noted that the State claims title to a substantial acreage within the Mineral Strip under land grants contained in its Enabling Act. Though the State holds no patents to this land, patents do not appear necessary for vesting title in these tracts. As in the case of patented lands, any valid rights of the State under its Enabling Act in Mineral Strip lands are fully protected by both the saving clause in section 3 of the Indian Reorganization Act, which provides, "[t]hat valid rights or claims of any persons to any lands so withdrawn existing on the date of the withdrawal shall not be affected by this Act * * *," and by Order No. 2874, which makes restoration of mineral interests "subject to any valid existing rights." Any valid claims of the State as to both the surface and subsurface of the lands it claims are fully and adequately protected against any action by the Secretary in restoring subsurface rights to the Indians, and, therefore, the State is not aggrieved in the sense of having suffered a legal wrong which would afford it standing to contest the restoration order.

The State, nevertheless, seeks to establish an actual controversy in this case by claiming that the defendants and the Tribe have, through the arguments of their counsel, "repeatedly brought the issue of the State's title to land in the Mineral Strip into question," and that the State's right in these lands "is now being challenged by the order of the Under-Secretary of the Interior restoring the subsurface of these lands to tribal ownership."

With respect to the State's first contention, the Court simply notes that it is without jurisdiction to try title to lands

in Arizona. As far as the second argument is concerned, it is once more emphasized that Order No. 2874 specifically protects any valid existing rights which the State has in the lands of the Mineral Strip, and this suit, in which the State of Arizona voluntarily intervened, does not in any way purport to test such rights.

Therefore, the Court concludes that neither the individual plaintiffs nor the State of Arizona have standing to sue in this case, nor does a case or controversy exist between the parties to this litigation.

## II.

Assuming, however, *arguendo* that the plaintiffs and/or the State of Arizona do have standing to bring this action, it is nevertheless the opinion of this Court that the Secretary of the Interior has the authority under sections 3 and 7 of the Indian Reorganization Act to restore the lands in the Mineral Strip to the tribal ownership of the San Carlos Apache Indians.

Section 3 of the Wheeler-Howard Act, 25 U.S.C. § 463, provides in pertinent part as follows:

> "The Secretary of the Interior, if he shall find it to be in the public interest, is hereby authorized to restore to tribal ownership the remaining surplus lands of any Indian reservation opened before June 18, 1934, or authorized to be opened, to sale, or any other form of disposal by Presidential proclamation, or by any of the public-land laws of the United States: *Provided, however,* that valid rights or claims of any persons to any lands so withdrawn existing on the date of the withdrawal shall not be affected by this Act. * * * "

It is conceded on all sides that the San Carlos Mineral Strip was opened to sale prior to the date of enactment of this Act on June 18, 1934. Therefore, the principal issue to be resolved is whether the Mineral Strip constitutes "surplus lands of any Indian reservation" within the meaning and purpose of the Act.

Section 7 of the Indian Reorganization Act, 25 U.S.C. § 467, authorizes the Secretary to add lands acquired pursuant to any provision of the Act, including section 3, to existing reservations. Assuming the Secretary acted with authority under section 3 in this case, there would appear to be no objection to the portion of Order No. 2874 which makes subsurface interests in the Mineral Strip a part of the San Carlos Indian Reservation.

The plaintiffs and the State of Arizona argue that the term, "surplus lands of any Indian reservation," refers only to land which was subject to the General Allotment Act of 1887, 24 Stat. 388, 25 U.S.C. § 331 et seq., and which had not been allotted at the time restoration is sought. Since there are no allotted lands on the San Carlos Apache Reservation or the Mineral Strip, if this interpretation were accepted, the Mineral Strip would clearly not be subject to restoration under section 3 of the Wheeler-Howard Act.

On the other hand, the defendants and the Tribe, while conceding that the bulk of the Congressional discussion concerning section 3 related to surplus lands under the General Allotment Act, maintain that "surplus lands" also means remaining undisposed of lands which were ceded to the United States to be disposed of by the United States in various ways, the proceeds of the sales to be held for the benefit of the Indians. Their position is strongly supported by a history of both contemporaneous and continuous interpretation by the Department of the Interior of the Indian Reorganization Act which is consistent with their present argument.

To reiterate briefly the historical background of this case, the San Carlos Indian Reservation was created by Executive Order on December 14, 1872. By Article I of an agreement dated February 25, 1896, as ratified by the Act of June 10, 1896, 29 Stat. 321, 358, the In-

dians of the San Carlos Reservation did "cede, grant, and relinquish to the United States all right, title, and claim which they may have in and to" an area of about 232,000 acres now known as the Mineral Strip. Instead of an outright payment for the lands, however, by Article II of the 1896 Agreement, the United States stipulated and agreed "to place in the Treasury of the United States to the credit and for the sole benefit of the said Apache, Mohave, and Yuma Indians * * * the net proceeds accruing from the disposal of such coal and mineral lands, lying within the ceded territory, under the laws applicable thereto. * * *" From 1896 to 1931, while all lands within the Mineral Strip were subject to disposition under the mineral land laws, the Tribe received from such entries net revenue amounting to only $12,433. In view of the insignificant financial returns to the Indians under this agreement, the First Assistant Secretary of the Interior, at the Indians' request, on March 30, 1931, withdrew "all vacant, unappropriated and undisposed of" lands within the Mineral Strip from all valid rights and claims, pending the enactment of legislation sanctioning the restoration of the area to the Tribe.

On June 18, 1934, Congress passed the Indian Reorganization Act, which was expressly designed to "conserve and develop Indian lands and resources." Section 3 of the Act authorized the Secretary of the Interior "to restore to tribal ownership the remaining surplus lands of any Indian reservation" previously opened to sale or disposal.

On August 10, 1934, less than sixty days after approval of the Act, the Commissioner of Indian affairs recommended, and a month later Secretary of the Interior Ickes directed, that all undisposed of lands of certain Indian reservations:

"* * * be temporarily withdrawn from disposal of any kind, subject to any and all existing valid rights, until the matter of their permanent restoration to tribal ownership, as authorized by section 3 of the Act of June 18, 1934, *supra,* can

be given appropriate consideration. *The intention is to withdraw only lands the proceeds of which, if sold, would be deposited in the Treasury of the United States for the benefit of the Indians.*" (Emphasis added.) 54 I.D. 559, 563.

The San Carlos Mineral Strip, ceded by the agreement of February 25, 1896, is the first tract listed in the Secretary's 1934 withdrawal order.

Thus, coincident with the passage of the Indian Reorganization Act, the Secretary of the Interior interpreted section 3 to pertain to lands ceded to the United States, the proceeds from the sale thereof to be held by the United States for the benefit of the Indians and clearly included the San Carlos Mineral Strip within the scope of this construction.

"When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration." Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.'" Power Reactor Development Co. v. International Union of Elec., Radio and Mach. Workers, AFL-CIO, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 934 (1961); Udall v. Tallman, supra.

Moreover, as the following discussion will demonstrate, officials of the Interior Department since 1934 have consistently adhered to this determination that lands in the class of the Mineral Strip, i. e., "lands the proceeds of which, if sold would be deposited in the Treasury of the United States for the benefit of the Indians," are subject to restoration under section 3 of the Wheeler-Howard Act.

In an unpublished Opinion (M–27878, paraphrased in 69 I.D. 195), approved by the Assistant Secretary on May 20, 1936, and in a memorandum to the Commis-

sioner of the Indian Affairs, dated November 30, 1937 (quoted in 69 I.D. 195), the Solicitor's Office of the Interior Department adhered to this interpretation of the definition of the term "surplus lands of any Indian reservation."

On June 15, 1938, the then Assistant and later Secretary of the Interior, Oscar L. Chapman, reaffirmed the Department's interpretation of "surplus lands," as used in section 3 of the Wheeler-Howard Act, in the following language, which also plainly covers the San Carlos Mineral Strip.

> "The word 'surplus' means that which remains over and above what is required. It might be argued that practically all lands ceded by Indians were surplus lands according to this definition since they were doubtless considered as not being required by the Indians. However, Congress could not have intended that all remaining undisposed-of ceded lands should be available for restoration to tribal ownership, as such lands would embrace practically all of the remaining public domain. The Interior Department has taken the position that *section 3 is not intended to cover all ceded lands but those ceded lands in which the Indians have retained an interest by reason of the fact that the lands were ceded to the United States to be disposed of by the United States in specified ways, the proceeds of the sale to be held for the benefit of the Indians.* This type of ceded land was evidently in the mind of Congress at the time of the passage of the Reorganization Act. The debates on the bill in the Senate show that section 3 was discussed as a provision making possible the restoration of the use of the lands to the Indians in place of the proceeds to which they were entitled from any sale." (Emphasis added.) 56 I.D. 330, 334.

Assistant Secretary Chapman further determined in his 1938 opinion that, to qualify for restoration, land need have been part of a reservation only at the time it was ceded to the United States.

In an opinion issued January 17, 1960, holding that certain ceded lands previously reserved for school and agency purposes could be restored by the Secretary to the Kiowa, Comanche and Apache Indians under section 3, even though no trust relationship as such was involved, the Solicitor observed:

> "The rationale of the interpretations and the administration by the Department of section 3 of the 1934 Act is that the significant and controlling factor under this legislation is the existence of a tribal right to proceeds from the sale of the lands and not the narrower question of the existence or absence of a trust title. This interpretation is in harmony with the language of the act and its broad purpose to augment the tribal land base." 67 I.D. 10.

Lastly, as already indicated supra, on November 28, 1962, the Solicitor of the Interior Department in an opinion, 69 I.D. 195, expressly held that undisposed of lands in the Mineral Strip are surplus lands of an Indian reservation within the context of section 3 of the Indian Reorganization Act and that the Secretary of the Interior has discretionary authority to restore such lands to tribal ownership.

Hence, from 1934 through 1962, the Department of the Interior has repeatedly and consistently construed section 3 of the Indian Reorganization Act as authorizing restoration to tribal ownership of lands in the class of the Mineral Strip. " 'To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' " Unemployment Compensation Comm'n of Territory of Alaska v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 90 L.Ed. 412 (1946), as quoted in Udall v. Tallman, supra, 380

U.S. at 16, 85 S.Ct. at 801. Since the Interior Department's interpretation was based in the first instance on the knowledge of the plight of the San Carlos and similarly situated Indians and the fact that this legislation was sought to alleviate their situation, that section 3 was not interpreted narrowly to apply only to land surplus to allotment but was given a broader interpretation to include land surplus to other needs of the Indians when ceded, is not—in the opinion of this Court—an unreasonable position to take in light of all the circumstances surrounding the enactment of the legislation. " 'It therefore comes within the rule that the practical construction given to an act of Congress, fairly susceptible of different constructions, by those charged with the duty of executing it is entitled to great respect and, if acted upon for a number of years will not be disturbed except for cogent reasons.' " McLaren v. Fleischer, 256 U.S. 477, 481, 41 S.Ct. 577, 65 L.Ed. 1052 (1921), as quoted in Udall v. Tallman, supra, 380 U.S. at 18, 85 S. Ct. at 802.

Such an interpretation is likewise in keeping with the well-recognized canon of statutory construction that treaties with Indian tribes and laws affecting Indians must be liberally construed for their benefit and protection. Tulee v. State of Washington, 315 U.S. 681, 684–85, 62 S.Ct. 862, 86 L.Ed. 1115 (1942); Choate v. Trapp, 224 U.S. 665, 675, 32 S.Ct. 565, 56 L.Ed. 941 (1912); Jones v. Meehan, 175 U.S. 1, 10–11, 20 S.Ct. 1, 44 L.Ed. 49 (1899).

By accepting the Interior Department's interpretation that section 3 applies to ceded "lands the proceeds of which, if sold, would be deposited in the Treasury of the United States for the benefit of the Indians," the Court need not determine whether such an arrangement creates an actual trust relationship between the United States and the San Carlos Apache Indians. See Ash Sheep Co. v. United States, 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507 (1920). What is important insofar as the Secretary of the Interior's authority to restore the lands in the Mineral Strip to tribal ownership under this statute is concerned, is the fact that the 1896 agreement between the United States and the Tribe clearly created this type of arrangement, and the Secretary has recognized that agreement as meeting the requirements of the Act from the time he took his first action under the Act by withdrawing the Mineral Strip from disposal of any kind (in September, 1934).

For the foregoing reasons, the Court concludes that the Secretary of the Interior has the authority under sections 3 and 7 of the Indian Reorganization Act to restore the subsurface of the undisposed of lands of the San Carlos Mineral Strip in question to tribal ownership, for the use and benefit of the San Carlos Apache Tribe of Indians.

This memorandum opinion shall comprise the Court's findings of fact and conclusions of law in the case.

It is further ordered that the preliminary injunction granted to the plaintiffs in this case on September 13, 1963 is hereby vacated and set aside.