Bryan L. STEVENS and Bryan L. Stevens as surviving spouse of Alma Stevens, Deceased, Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Bryan L. STEVENS and Bryan L. Stevens as surviving spouse of Alma Stevens, Deceased, Petitioner-Appellee,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.

Nos. 26193, 26281.

United States Court of Appeals, Ninth Circuit.

Nov. 26, 1971.

Charles A. Hobbs (argued), Jerry C. Straus, Patricia L. Brown, of Wilkinson, Cragun & Barker, Washington, D. C., Stephen Granat, of Granat & Cole, Malta, Mont., for appellant.

Meyer Rothwacks (argued), Bennet N. Hollander, Carolyn R. Just, of Dept. of Justice, Johnnie M. Walters, Asst. Atty. Gen., Tax Div., K. Martin Worthy, Chief Counsel, Washington, D. C., for appellee.

Robert D. Dellwo (argued), Spokane, Wash., amicus curiae.

Before KOELSCH and HUFSTEDLER, Circuit Judges, and JAMESON,* District Judge.

JAMESON, District Judge:

These cross-appeals involve alleged deficiencies in income tax for the years 1958 and 1959.

The taxpayer, Bryan L. Stevens, is a noncompetent [1] Gros Ventre Indian, enrolled with the Fort Belknap Indian Reservation. All of his income was derived from farming and ranching operations on reservation land, including lands acquired by (1) allotment, (2) gift from his mother to whom the land had been allotted, (3) purchase from other Indian allottees, and (4) purchase of inherited interests in allotted lands from the Regional Director, Bureau of Indian Affairs. Legal title to all of these lands was held by the United States in trust for the taxpayer.[2] In addition the taxpayer

---

* Honorable William J. Jameson, United States Senior Judge, Billings, Montana, sitting by designation.

1. A noncompetent Indian is one who holds allotted lands only under a trust patent and may not dispose of his property without the approval of the Secretary of the Interior. It does not denote mental incapacity.

2. All of the original allotments provide that the United States "will hold the land thus allotted (subject to all statutory provisions and restrictions) for the period of twenty-five years, in trust for the sole use and benefit of the said Indian and at the expiration of said period the United States will convey the same by patent to said Indian in fee, discharged of said trust and free from all charge and incumbrance whatsoever; * * *."

had leased a substantial acreage from the Gros Ventre tribe and from relatives.[3]

The joint returns filed by the taxpayer and his spouse, Alma Stevens,[4] for 1958 and 1959 show adjusted gross income in the respective amounts of $13,013.01 and $12,534.08. The taxpayer computed and paid self-employment tax on this sum. He paid no income tax, attaching to each return a statement that he was "a ward of the government, being an enrolled Indian at the Fort Belknap Indian Agency, Harlem, Montana" and claiming exemption from federal income taxes by virtue of Rev.Rul. 56–342, 1956–2 Cum.Bul.20.

In a notice of deficiency the Commissioner made certain adjustments which increased the gross adjusted income for 1958 to $19,582.45 and for 1959 to $13,988.78.[5] In this notice the Commissioner held that all of the taxpayer's income was taxable except for the pro-rata portion allocable to his original allotment and the land acquired from his mother. Later the Commissioner took the position, and now contends, that only the income from those lands granted to the taxpayer and his mother as "homestead" allotments were exempt.[6]

The taxpayer filed a petition with the Tax Court for redetermination of the deficiency. The Tax Court held that the portions of taxpayer's income derived from leased lands and from the lands purchased from Joseph Shawl and Lillian Werle were taxable, 52 T.C. 330, 54 T.C.

351. The taxpayer does not question the Tax Court's holding that the income from the leased lands is taxable, but appeals from that portion of the judgment holding that the income from the lands purchased from the other Indian allottees, i. e. Shawl and Werle, were not exempt from taxation. (No. 26,193). The Tax Court held that income from all lands acquired by the taxpayer by allotment, gift from his mother, and purchase from the James Shawl estate were exempt. From this portion of the judgment the Commissioner has appealed. (No. 26,281.) The Department of the Interior supports the position of the taxpayer on both appeals.

The determination of both appeals involves primarily the applicability and scope of the decision of the Supreme Court in Squire v. Capoeman, 1956, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883. In that case the taxpayers' lands had been granted to them under the General Allotment Act of 1887, 24 Stat. 388, 25 U.S.C. § 331 et seq. The Act provides that at the expiration of the trust period the United States will convey the land by patent "in fee, discharged of said trust and free of all charge or incumbrance whatsoever." 25 U.S.C. § 348. An amendment to Section 6 of the Act, 25 U.S.C. § 349, gives the Secretary of the Interior discretionary power to issue a fee patent which would remove "all restrictions as to sale, incumbrance, or taxation of said land * * *." The Court

---

3. Taxpayer's relative holdings are shown by the following table:

| Source | Acreage |
| --- | --- |
| Original Allotment in 1941 | 519.47 |
| Gift from mother in 1951 | 522.11 |
| Purchase in 1948 from James Shawl estate | 332.40 |
| Purchases from noncompetent Indians Joseph Shawl in 1947 (362.59 acres) and Lillian Werle in 1951 (360.00 acres) | 722.59 |
| Leases (15,628.02 from Tribal government 2,490.15 from relatives.). | 18,118.17 |
| Hay Permit | 332.40 |
| Total | 20,547.14 |

4. Mrs. Stevens and taxpayer were legally separated in 1962. She died, intestate, and domiciled in California in 1965. Under California law her heirs were the taxpayer and a daughter by a previous marriage.

5. Although taxpayer contested these adjustments in his petition filed before the Tax Court, he did not press his objections either before that court or here.

6. The taxpayer received allotments totaling 519.47 acres of which 303.83 acres were allotted as a homestead. The gift from his mother was for 522.11 acres, of which 204.48 acres were allotted as a homestead.

held that under these provisions income derived from the sale of timber from the allotted lands was exempt from capital gains taxes.

The Court recognized that "to be valid, exemptions to tax laws should be clearly expressed" and that the "Government's promise to transfer the fee 'free of all charge or incumbrance whatsoever' * * is not expressly couched in terms of non-taxability," but referred to its prior holding in Carpenter v. Shaw, 1930, 280 U.S. 363, 367, 50 S.Ct. 121, 74 L.Ed. 478, that "Doubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith," quoting the words of Chief Justice Marshall in Worcester v. State of Georgia, 6 Pet. (31 U.S.) 515, 582, 8 L. Ed. 483, that, "The language used in treaties with the Indians should never be construed to their prejudice." 351 U.S. at 6–7, 76 S.Ct. at 615.

The Court also quoted with approval the opinion of Attorney General Stone in which he stated that he was

"(U)nable, by implication, to impute to Congress under the broad language of our Internal Revenue Acts an intent to impose a tax for the benefit of the Federal Government on income derived from the restricted property of these wards of the nation; property the management and control of which rests largely in the hands of officers of the Government charged by law with the responsibility and duty of protecting the interests and welfare of these dependent people. In other words, it is not lightly to be assumed that Congress intended to tax the ward for the benefit of the guardian." 34 Op.Atty. Gen. 439, 445 (1925) as quoted in Capoeman, 351 U.S. at 8, 76 S.Ct. at 616.

Capoeman is not a technical or narrow decision; nor is its holding limited to capital gains taxes. Rather the Court found implicit in Section 5 and the amendment to Section 6 of the General Allotment Act a "congressional intent to subject an Indian allotment to all taxes only after a patent in fee is issued to the allottee." [7] 351 U.S. at 8, 76 S.Ct. at 616.

■ The Commissioner argues that by reason of differences in the provisions of the General Allotment Act of 1887 and the Fort Belknap Allotment Act of March 3, 1921, 41 Stat. 1355, under which the allotted lands were granted, Squire v. Capoeman is not applicable. It is true that the Fort Belknap Allotment Act does not contain the provision that the allotments are granted "free of all charge or incumbrance." Federal policy toward particular Indian tribes is often manifested through a combination of general laws, special acts, treaties, and executive orders. All must be construed in pari materia in ascertaining congressional intent. Kirkwood v. Arenas, 9 Cir. 1957, 243 F.2d 863, 867.

By a Joint Resolution of June 19, 1902, 32 Stat. 744, Congress provided:

"Insofar as not otherwise specially provided, all allotments in severalty to Indians, outside of the Indian Territory, shall be made in conformity to the provisions of the Act approved February eighth, eighteen hundred and eighty-seven, entitled 'An Act to provide for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the Territories over the Indians, and for other purposes,' and other general Acts amendatory thereof or supplemental thereto, and shall be sub-

---

7. The Court also quoted with approval from Cohen, Handbook of Federal Indian Law, 265, where "Felix S. Cohen, an acknowledged expert in Indian law," said "that 'it is clear that the exemption accorded tribal and restricted Indian lands extends to the income derived di- rectly therefrom.'" The Court noted also that Mr. Cohen "distinguished cases permitting the imposition of income taxes upon income derived from unrestricted lands, and upon reinvestment income." 351 U.S. at 8–9, 76 S.Ct. at 616.

ject to all the restrictions and carry all the privileges incident to allotments made under said Act and other general Acts amendatory thereof or supplemental thereto."

The provisions of the General Allotment Act were extended to lands purchased for the benefit of Indians by the Act of February 14, 1923, 42 Stat. 1246, 25 U.S.C. § 335. That Act reads:

"That unless otherwise specifically provided, the provisions of the Act of February 8, 1887 (Twenty-fourth Statutes at Large, page 388), as amended, be, and they are hereby, extended to all lands heretofore purchased or which may hereafter be purchased by authority of Congress for the use or benefit of any individual Indian or band or tribe of Indians." [8]

 These acts manifest a Congressional intent that the benefits and restrictions of the General Allotment Act are to apply to all Indian allotments in the absence of special legislation indicating a different intent. This construction is of course in accord with long-standing Congressional policy of treating Indians equally except where differences in tribal circumstances justify special legislation.

Does the omission of the provision for a fee patent "free of all charge or incumbrance" in the Act of March 3, 1921 manifest a Congressional intent that allottees under this Act are to be treated differently from Indians who received their allotments under the General Allotment Act of 1887? It is noted first that this Act was passed subsequent to the Joint Resolution of June 19, 1902, supra.[9] Under the 1921 Act the Secretary of the Interior was "authorized and directed to allot pro rata, under rules and regulations and in such areas and classes of lands as may be prescribed by him, among such enrolled Indians all the unreserved and otherwise undisposed-of lands on the Fort Belknap Reservation, which trust patents shall be issued in the names of the said allottees. * * * " The Secretary included in the trust patents issued under this Act a provision that the United States would hold the land "for the period of twenty-five years, in trust for the sole use and benefit of the said Indian and at the expiration of said period the United States will convey the same * * * in fee, discharged of said trust and free from all charge and incumbrance whatsoever * * *."

It is the position of the Department of the Interior [10] that "the reference to trust patents in the Act of March 3, 1921, and the discretionary authority given the Secretary of the Interior to prescribe rules and regulations, authorized the issuance, as was done here, of allotments under the 1921 Act having the same guarantees as allotments under the General Allotment Act of 1887."

---

8. The Commissioner cites St. Marie v. United States, 9 Cir. 1940, 108 F.2d 876, cert. den. 1940, 311 U.S. 652, 61 S.Ct. 35, 85 L.Ed. 417, for the proposition that this Act "was not intended to extend the General Allotment Act to Indians who had received their allotments under these special statutes." The purpose of the 1923 Act was to make it clear that the General Allotment Act applied to "purchased land." In St. Marie the majority of the court held that specific provisions of the Mission Indian Act were contrary to the General Allotment Act, following an interpretation of the Secretary of the Interior. To the extent that the opinion may, hold that the General Allotment Act and special statutes are not to be construed in *pari materia*, it is inconsistent with subsequent decisions of this court. See United States v.

Arenas, 9 Cir. 1946, 158 F.2d 730, 751–752, cert. den. 1947, 331 U.S. 842, 67 S.Ct. 1531, 91 L.Ed. 1853; Arenas v. United States, 9 Cir. 1952, 197 F.2d 418, 422; Kirkwood v. Arenas, 9 Cir. 1957, 243 F.2d 863, 866–867.

9. In this respect it differs from the Act of May 1, 1888 (25 Stat. 113) providing for a limited number of allotments to Gros Ventre Indians who had settled on lands belonging to the United States, where the "free of all charge or incumbrance" clause was included.

10. The position of the Department of the Interior is set forth in a statement included at its request in the Commissioner's brief, and also in a letter to the Solicitor General of the United States attached as an appendix to the taxpayer's brief.

Section 5 of the Indian Reorganization Act of 1934, 48 Stat. 985, 25 U.S.C. § 465, authorized the Secretary of the Interior "in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands * * including trust or otherwise restricted allotments." It further provided that title "shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands * * * shall be exempt from State and local taxation."

With respect to the lands purchased for the taxpayer, it is the position of the Interior Department "that the Act of February 14, 1923, extending provisions of the General Allotment Act to 'lands purchased by authority of Congress,' clearly extended to these purchased lands the principal provision of trust expressed in the General Allotment Act, that is, the promise to transfer the land at the end of the period free of all charge or encumbrance whatsoever * * *;" and this, "coupled with the authority under the Indian Reorganization Act of 1934 for the Secretary to purchase land for Indians, clearly expresses an intent by Congress to exempt these lands from income taxation."

The brief of the Department states "that it has made no distinction between the trusts which were established pursuant to the General Allotment Act of 1887 and those established pursuant to the Indian Reorganization Act of 1934." The brief continues:

"The practice since the enactment of the Indian Reorganization Act of 1934 has implicitly given Indian purchasers the impression that Interior made no distinction under the various Acts and that purchased tracts of lands taken in trust for the purchaser were subject to the same nonencumbrance provisions as the tracts allotted under the General Allotment Act of 1887. According to Interior, even though the acts are silent as to exemption from federal income tax, they should be construed broadly to achieve the general objective of nonencumbrance. Thus,

it is the position of the Department of the Interior that any doubts as to exemption from federal income tax are resolved by its consistent administrative construction of the acts involved."

■ As the agency charged with the administration of the Indian laws and responsible for drafting many of them, Interior's interpretation is entitled to "great weight" and "is not to be overturned unless clearly wrong * * *." United States v. Jackson, 1930, 280 U.S. 183, 193, 50 S.Ct. 143, 146, 74 L.Ed. 361. Cf. Board of County Commissioners v. Seber, 1943, 318 U.S. 705, 710–711, 63 S.Ct. 920, 87 L.Ed. 1094; Bowman v. Udall, D.C.D.C.1965, 243 F.Supp. 672, 681–683, aff'd sub. nom; Hinton v. Udall, 1966, 124 U.S.App.D.C. 283, 364 F.2d 676, cert. den., 1966, Hinton v. United States, 385 U.S. 878, 87 S.Ct. 159, 17 L.Ed.2d 105.

■ The General Allotment Act of 1887, "with its various amendments, constitute part of a single system evidencing a continuous purpose on the part of the Congress. The statutes are in pari materia, and must be so construed." United States v. Jackson, supra, 280 U.S. at 196, 50 S.Ct. at 147. The Joint Resolution of 1902, the Acts of March 3, 1921 and March 14, 1923, and the Indian Reorganization Act of 1934 are also a part of the system and must be construed with the General Allotment Act.

■ Construing all applicable statutes together, and giving weight to their interpretation by the Department of the Interior and Interior's long established practice, we conclude that the Tax Court was correct in holding that the taxpayer's "income derived from farming and ranching operations on his allotted lands, his lands received by gift from his mother, and his land acquired by order transferring inherited lands is exempt from Federal income tax." Accordingly we affirm in No. 26,281.

There remains for consideration the taxpayer's appeal from the holding of the Tax Court that the income derived from the allotted lands purchased by the tax-

payer is not exempt from Federal income tax. One tract was purchased with the taxpayer's funds from Joseph Shawl. The other was acquired from Lillian Werle in exchange for a parcel of land which the taxpayer had purchased from Edward Phares.

There is of course no question that income from the purchased lands was exempt from taxation while the lands were held by the original allottees. Did they become subject to taxation by reason of their purchase by another noncompetent Indian?

It was stipulated that it is customary practice on the Fort Belknap Indian Reservation for the Secretary of the Interior to allow an Indian who applies to sell his restricted lands to enter into negotiations respecting the sale and the selling price. The Secretary approved applications of Shawl and Phares to sell their lands to the taxpayer and, in accordance with the taxpayer's request, the United States acquired legal title to these tracts in trust for the taxpayer.[11]

It is the position of the taxpayer and the Interior Department that the Secretary acquired the lands pursuant to Section 5 of the Indian Reorganization Act of 1934, that this acquisition was subject to the General Allotment Act of 1887 by reason of the 1923 Act, 25 U.S.C. § 335, supra, extending the provisions of the General Allotment Act to "all lands * * which may hereafter be purchased by authority of Congress for the use or benefit of any individual Indian * * *,"

and that the income derived from these lands is therefore exempt under Capoeman. The Tax Court, however, held that "section 335 is referring to land purchased by the United States for the use of Indians and not to lands purchased by the Indian himself."

In our opinion the Tax Court has placed too narrow a construction on section 335 and clearly has adopted a construction contrary to the established practice of Interior ever since the enactment of the Indian Reorganization Act in 1934. It is true that the taxpayer provided the funds with which the purchased lands were acquired, but legal title was taken in the name of the United States in trust and for the use and benefit of a noncompetent Indian.[12] The lands were purchased by "authority of Congress" pursuant to the Indian Reorganization Act.

The Commissioner also argues that the second paragraph of section 5,[13] authorizing the appropriation of not to exceed $2,000,000 annually for the purchase of lands, limits Interior's authority under that section to the purchase of lands with federal funds. We cannot agree. Nothing in this paragraph indicates that it is any more than it purports to be, a measure authorizing the appropriation of funds to assist the Secretary in carrying out powers granted by the first paragraph. A holding that his power to purchase land under section 5 is limited to purchasing land with funds appropriated by Congress is hardly in accord with the

---

11. A noncompetent Indian can with the approval of the Secretary purchase trust lands and take title in fee.

12. The purchase by the United States for the individual Indian is analogous to the purchase of property by a conventional trustee with funds provided by the beneficiary. The United States is more than the mere holder of a legal title. There is little a noncompetent Indian can do with his land without the consent of his "trustee". All sales or leases of trust land require the consent of the Secretary, 25 U.S.C. §§ 396, 404, 405, 25 C.F.R. §§ 121.9, 131.5(a), and the terms and conditions of sale are rigidly regulated. Even such common place uses of

land as grazing or lumbering are subject to regulation. 25 C.F.R. §§ 141, 142, 151.

13. As noted supra, the first paragraph of section 5 authorizes the Secretary to acquire "through purchase, relinquishment, gift, exchange, or assignment, any interest in lands * *. * within or without existing reservations * * * for the purpose of providing land for Indians." The second paragraph authorizes an appropriation not to exceed $2,000,000 in any one year for the "acquisition of such lands * * * and for expenses incident to such acquisition."

deliberately broad and flexible grant of power contained in the first paragraph of section 5 itself.[14]

■ One of the purposes of the Reorganization Act was to put an end to the allotment system which had resulted in a serious diminution of Indian land base and which, through the process of intestate succession, had resulted in many Indians holding uneconomic fractional interests of the original allotments. A successful program of rebuilding this land base and consolidating individual holdings into economic units requires that the Secretary have a large measure of flexibility in the acquisition of additional lands. One obvious means by which these dual goals could be accomplished was the purchase of lands by Indians from other Indians. This has been recognized by Interior in its administration of the Act.

The practical result of now departing from Interior's established policy and adopting the construction of the Act urged by the Commissioner is set forth in the letter from the Solicitor of the Department of the Interior to the Solicitor General:

"Many Indians have purchased trust lands, or exchanged their allotments or interests in allotments for trust lands which were then taken in trust for them by the United States, with knowledge that the income derived from that land to the former beneficial owner was not subject to encumbrance (and therefore not taxable). Since the Indians were not informed that they were giving up a right which would not be included in the purchased tract, it is natural that they would assume in making an exchange that the purchased tract was subject to the same nonencumbrance provisions as those they held under the General Allotment Act. The Federal Government has encouraged such purchases and exchanges in carrying out relocation and other economic programs and particularly in dealing with the heirship land problem which has been growing increasingly difficult to administer as interests in trust lands become more fractionated. Had this question arisen and been settled in accordance with the present assertion of the Internal Revenue Service soon after the Act of June 18, 1934, was enacted, certainly the implication which has been conveyed to Indians across the country could have been avoided." [15]

■ The Department included in all of the trust patents to the original Fort Belknap allottees a provision that the United States would convey by patent in fee "free from all charge and incumbrance whatsoever." This is an obligation of the United States which may not be disregarded unless it is clearly contrary to Congressional intent.[16] There has been no action to indicate that Congress has questioned the consistent and long established position of the Department of the Interior, that income from trust lands acquired under the General Allotment Act, special acts and Indian Reorganization Act is exempt from federal income taxes.

14. It is true, as the Commissioner points out, that section 5 also provides that lands acquired pursuant to the Reorganization Act "shall be exempt from State and local taxation." However, in so doing, Congress only made explicit what was always implied under the General Allotment Act. We find no indication that in using this language Congress intended to deprive Indians of any benefits to which they might have been entitled under the General Act.

15. A statement issued by the Commissioner of Indian Affairs dated June 26, 1936, attached to the taxpayer's reply brief, recognizes that transfers in the form of sales, gifts, and exchanges may be made between Indians "under the authority contained in section 5."

16. In Squire v. Capoeman the Court referred to "the tax exemption afforded by the General Allotment Act, and the solemn undertaking in the patent," concluding that to tax respondent under the circumstances of that case "would, in the words of the court below, be 'at the least, a sorry breach of faith with these Indians.' " 351 U.S. at 10, 76 S.Ct. at 617.

Bearing in mind that "doubtful expressions are to be resolved" in favor of the Indians (Squire v. Capoeman, supra) and giving weight to the interpretation of the various acts by Interior, we conclude that the Secretary of the Interior has the discretionary power under the Indian Reorganization Act to purchase land for Indians with funds supplied by them and when lands are so purchased they are subject to the implied exemption from income taxation contained in the General Allotment Act.

The decision of the Tax Court in No. 26,281 (Commissioner's appeal) is affirmed, and its decision in No. 26,193 (taxpayer's appeal) is reversed.