S. Jack **HINTON** et al., Appellants,

v.

Stewart L. **UDALL**, Individually and as Secretary of the Interior, et al., Appellees.

No. 19671.

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 17, 1966.

Decided June 27, 1966.

Petition for Rehearing Denied Aug. 15, 1966.

Certiorari Denied Oct. 10, 1966.

See 87 S.Ct. 159.

Mr. Rex E. Lee, Phoenix, Ariz., with whom Messrs. Ozell M. Trask, Phoenix, Ariz., and William E. Rollow, Washington, D. C., were on the brief, for appellants Hinton et al.

Mr. Dale R. Shumway, Phoenix, Ariz., of the bar of the Supreme Court of Arizona, pro hac vice, by special leave of court, with whom Mr. Darrell F. Smith, Mesa, Ariz., was on the brief, for appellant State of Arizona.

Mr. Raymond N. Zagone, Attorney, Department of Justice, with whom Messrs. Roger P. Marquis and Floyd L. France, Attorneys, Department of Justice, were on the brief, for appellees Udall et al.

Mr. Arthur Lazarus, Jr., Washington, D. C., for appellee, San Carlos Apache Tribe of Indians.

Before DANAHER, McGOWAN and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge.

In this action, appellants sought to enjoin the Secretary of the Interior from restoring surface or subsurface rights in certain lands in Arizona to the San Carlos Apache Tribe of Indians (hereafter "Indians" or "Tribe"), and further sought a declaratory judgment that the Secretary's restoration of subsurface rights to the Tribe, subject to existing rights, is illegal.

The lands involved were part of the San Carlos Reservation, which was created by executive order in 1872. By an 1896 agreement between the Indians of the reservation and the Government, the Indians ceded an area of approximately 232,000 acres, known as the "Mineral Strip," to the United States; in return the United States agreed to place in the Treasury, for the benefit of the Indians, "the net proceeds accruing from the disposal of such coal and mineral lands." In the statute approving the agreement, Congress expressly provided that "the lands so surrendered shall be open to occupation, location, and purchase, under the provisions of the mineral-land laws only."[1]

On March 30, 1931, the Department of the Interior, in response to the Tribe's desire that the lands be returned to it, and in view of the insignificant financial returns that had accrued to the Indians by virtue of the 1896 arrangement, withdrew the Mineral Strip lands from all forms of entry. On September 19, 1934, Secretary Ickes issued an order which listed the Mineral Strip lands as among those to be "temporarily withdrawn from disposal of any kind, subject to any and all existing valid rights,"[2] pending decision as to whether they would be restored to tribal ownership under the provisions of the Indian Reorganization Act Wheeler-Howard Act),[3] passed June 18,

---

1. Act of June 10, 1896, ch. 398, 29 Stat. 321, 358.

2. Restoration of Lands Formerly Indian to Tribal Ownership, 54 I.D. 559, 563 (1934).

3. 48 Stat. 984, 25 U.S.C. § 461 *et seq.*

1934. In 1934, as today, the Mineral Strip lands were occupied by non-Indian ranchers, such as the individual appellants in this case. On February 14, 1936, part of the Mineral Strip lands were incorporated within a grazing district established by the United States pursuant to the provisions of the Taylor Grazing Act, passed June 28, 1934.[4] Some of the appellants hold grazing permits on Mineral Strip lands within that district; others hold Taylor Act grazing leases on Mineral Strip lands outside the district; and still others claim title to Mineral Strip lands under patents from the United States. The State of Arizona, also an appellant, has claims to certain of the lands under various grants made to it by the United States.[5]

In 1958 the Tribal Council of the San Carlos Tribe adopted Resolution 58–7, requesting the Secretary to restore both surface and subsurface rights in Mineral Strip lands to the Tribe. On November 28, 1962, the Solicitor of the Interior Department held that undisposed Mineral Strip lands were "surplus lands" within the meaning of Section 3 of the Indian Reorganization Act of 1934, and that the Secretary therefore had authority to restore them to the Tribe.[6] On December 10, 1962, Secretary Udall authorized Under Secretary Carr to determine whether such a restoration would be in the public interest. On January 10, 1963, appellants filed this action to enjoin and declare unlawful any such restoration.

On April 2, 1963, before any action had been decided upon by the Interior Department, the Tribal Council adopted Resolution 63–17, which requested return to the Tribe of sub-surface rights in the Mineral Strip. Resolution 58–7, with respect to surface rights, was withdrawn, to be "held in abeyance by the

Secretary until reactivated by the San Carlos Council." On June 17, 1963, Under Secretary Carr issued Order No. 2874,[7] restoring to the San Carlos Tribe all "mineral, oil and gas resources" in the Mineral Strip lands, "subject to any valid existing rights" and excluding any patented lands. Appellants then amended their complaint to attack the validity of Order No. 2874, but still sought to enjoin restoration to the Tribe of surface as well as sub-surface rights in the Mineral Strip. The State of Arizona was permitted to intervene as a party plaintiff. The Tribe intervened as a party defendant.

After a trial, the District Court held, 243 F.Supp. 672 (1965), that neither the individual appellants nor the State of Arizona had standing to challenge the Secretary's actions, and that there was no case or controversy presented on which to base jurisdiction.[8] Assuming jurisdiction arguendo, the trial judge ruled the Secretary had authority under Section 3 of the Indian Reorganization Act to restore the Mineral Strip sub-surface rights to the Tribe. We affirm the judgment of the District Court on the ground that appellants do not present a controversy with the Secretary that is ripe for judicial intervention. We express no view as to the correctness of the District Judge's determination on the merits.

■ Order No. 2874, restoring sub-surface rights to the Tribe, has not been shown to aggrieve appellants. The order by its terms is made "subject to any valid existing rights" in the Mineral Strip lands. Appellants make no showing that they have sub-surface rights which are impinged upon or affected by that order. The interests of those appellants who hold Taylor Act grazing per-

4. 48 Stat. 1269, 43 U.S.C. § 315 *et seq.*

5. The State's claims are based on conveyances to it pursuant to Sections 24 and 25 of the Arizona Enabling Act of 1910, ch. 310, 36 Stat. 557, 572 *et seq.*

6. Authority of the Secretary to Restore Lands, etc., 69 I.D. 195, 202 (1962).

7. 28 Fed.Reg. 4608 (1963).

8. In so holding, Judge Tamm disagreed with an earlier ruling by Judge Holtzoff, who, in granting appellants' motion for a preliminary injunction, as to patented lands, and denying appellees' motion for summary judgment, held that appellants did have standing to sue.

mits or leases were expressly made subordinate to mineral interests by Section 6 of the Taylor Act, 43 U.S.C. § 315e. None of the other appellants has brought forth evidence that the Secretary intends to apply the order in such a way as to override the rights they claim. Although there is a vague premonition that restoration of sub-surface rights could affect appellants' surface use, their contention in this regard is shadowy; it lacks the kind of specific showing of conflict between these uses necessary to trigger judicial intervention.[9]

In essence, the claim of the individual appellants, engaged as they are in ranching, is based not on injury from Order No. 2874 as it stands, but from the possibility that the order may be amended or enlarged to restore surface rights.

 That the Tribe initially sought restoration of surface as well as subsurface rights in the lands, that the Department took some steps in the processing of that request, and that the request, now withdrawn, may be reactivated at some time in the future, does not mean that the interests of appellants in surface rights to the lands are affected so as to give them standing to have such possible future action declared invalid.

Appellants say it is "likely" that the Tribe's request for restoration of surface rights will soon be reactivated. That

may be, but we have no way of predicting how the Secretary would act on such a request. True, the Solicitor of the Interior Department is of the opinion that the Secretary has the legal authority to restore the surface rights, and the appellants controvert that legal view. But a difference of opinion on legal issues is one for a moot court, and not our court, unless and until someone takes or threatens to take the action claimed to be illegal. There is no showing that restoration of surface rights will inexorably or even probably follow the action the Secretary has already taken. He may conclude that the public interest is served by stopping with restoration of sub-surface rights, and that the issue of surface rights presents different considerations. The Indian Reorganization Act does not require the Secretary to restore surface rights in the future simply because he has restored sub-surface rights. Section 3 of that Act authorizes restoration of surplus lands, but does not require it.

In our view this case calls for application of the doctrine rejecting as premature challenges to statutes and actions of officials or agencies by "litigants who have not been harmed or threatened with immediate harm" by such actions.[10] In applying this rule, as generally in applying the inter-related doctrines of ripeness and justiciability, we are called upon

9. Appellants argue that an effect on surface rights is conceded in the order itself, which provides that any sub-surface uses in Mineral Strip lands within the Coronado National Forest are to be subject to supervision by the Secretary of Agriculture for the protection of surface resources. The Government says that this provision is intended merely as a confirmation of existing responsibility for management of the Forest. The record is silent as to the purpose of this proviso, and as to what kind of surface uses, or protection, was contemplated. This provision is not of itself sufficient to show any existing or imminent injury to appellant's surface uses from the restoration of sub-surface rights.

10. Danville Tobacco Ass'n v. Freeman, 122 U.S.App.D.C. 135, 351 F.2d 832, 833 (1965). Other decisions of this court

holding similar attacks on administrative action premature include Alaska Airlines, Inc. v. Pan American World Airways, Inc., 116 U.S.App.D.C. 128, 130, 321 F.2d 394, 396 (1963); Brandenfels v. Day, 114 U.S.App.D.C. 374, 377, 316 F.2d 375, 378, cert denied, 375 U.S. 824, 84 S.Ct. 66, 11 L.Ed.2d 57 (1963); Wolff v. Benson, 103 U.S.App.D.C. 334, 335, 258 F.2d 428, 429 (1958); United Air Lines v. CAB, 97 U.S.App.D.C. 42, 228 F.2d 13 (1955).

The Supreme Court cases using similar language cautioning against premature adjudication have usually involved challenges to constitutionality of statutes. See, e. g. Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961); ILWU v. Boyd, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954); Rescue Army v. Municipal Court, 331 U.S. 549, 568-575, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947).

not for exercise in logic, or abstract application of all-embracing principles, but rather, in the words of Justice Frankfurter, for concrete evaluation of "the resultant of many subtle pressures, including the appropriateness of the issues for decision * * * and the actual hardship to the litigants of denying them the relief sought." Poe v. Ullman, 367 U.S. 497, 508–509, 81 S.Ct. 1752, 1759, 6 L.Ed.2d 989 (1961).[11]

The doctrine of ripeness often precludes immediate judicial consideration even in cases when judicial consideration seems well nigh inevitable; in such cases the doctrine operates to provide review later rather than earlier, and to assure review in a more concrete, focused context, on a more complete record.[12] Even more formidable are the barriers the court erects in situations like the case at bar where there is a reasonable possibility that the course of official action may be such, perhaps affected by negotiation with the suitors, that no submission to a court will be requisite.

When an agency has substantially crystallized its position, albeit in advance of the effective date of a sanction or order, the existence of a controversy ripe for judicial consideration may be sufficiently established by the present or imminent loss ascribable to the anticipated impact of the descending guillotine.[13] An interpretive or other regulation may have an immediate and practical impact as a messenger warning of consequences likely to follow, though not yet formally ordained.[14] But when the agency policy has not yet been given a form sufficiently precise to establish or forecast an interference with the rights of others, then the mere existence of financial harm, as in the case of impairment of credit, does not in and of itself suffice to establish a controversy ripe for judicial intervention.[15]

■ These principles undermine the effort of the individual appellants to show that the case is ripe for judicial consideration on the ground that the order has decreased the value of their property interests. This depressing effect is ascribed to the "cloud" cast by the Secretary's present and possible future actions.[16] Assuming a decline in

---

11. See generally JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION, ch. 10 (1965); 3 DAVIS, ADMINISTRATIVE LAW § 21.10 (1958). In Judge Friendly's phrase, these issues are not to be solved "by applying some readily procurable litmus paper." Toilet Goods Ass'n, Inc. v. Gardner, 360 F.2d 677 (2d Cir. 1966).

12. This aspect of the ripeness doctrine is particularly stressed in cases which avoid constitutional decisions, even where jurisdiction concededly exists, "until the issues are presented with clarity, precision and certainty,"—"in clean-cut and concrete form." Rescue Army v. Municipal Court, 331 U.S. 549, 576, 584, 67 S.Ct. 1409, 1423 (1947).

In other instances the questions are of such breadth that they may as wisely be treated at the threshold. E. G., Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952). Compare Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942). And where the governmental action challenged threatens rights protected by the First Amendment, courts may deem it particularly appropriate to intervene at an early stage. Bantam Books v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

13. Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 417–421, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942). See also Isbrandtsen Co. v. United States, 93 U.S.App.D.C. 293, 211 F.2d 51, cert. denied sub nom. Japan-Atlantic & Gulf Conference v. United States, 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124 (1954).

14. Frozen Food Express v. United States, 351 U.S. 40, 43–44, 76 S.Ct. 569, 100 L.Ed. 910 (1956); FCC v. American Broadcasting Co., 347 U.S. 284, 74 S.Ct. 593, 98 L.Ed. 699 (1954); Toilet Goods Ass'n, Inc. v. Gardner, supra note 11.

15. United States v. Los Angeles & S.L. R.R., 273 U.S. 299, 47 S.Ct. 413, 71 L.Ed. 651 (1927). Compare Allen v. Grand Central Aircraft Co., 347 U.S. 535, 539–540, 74 S.Ct. 745, 98 L.Ed. 933 (1954).

16. The principal witness on this point was an appellant ranching some 20,000 acres. He said that in 1946 he paid almost $175,000 for a grazing lease of approximately 13,000 acres, a payment "for the other man's right to lease Taylor Graz-

value as claimed, it is ascribable primarily if not solely to apprehensions concerning the possible restoration of surface rights to the Indians. The doctrine whereby courts refrain from deciding the legality of official actions that may never be taken in fact cannot be circumvented by showing that the overhanging possibility of such actions is depressing land values. Land value quotations may be affected by many possibilities far too speculative, contingent and unformed to permit determination of judicial validity. Land values, like securities values, are sensitive to mere expressions of interest in buying and selling, or even to the mere existence of an interest sufficient to warrant analysis by sellers and buyers as to the possibility of zoning changes, corporate expansions, new Government programs, and the like. Where fears or hopes are based on underlying contingencies that have not developed in reasonably firm and concrete form, the resulting effects on market value are insufficient to warrant judicial determination of the legality of the unformed possibility.

There may be cases where impairment of market values ensuing as a result of official action establishes, or helps to establish, standing and ripeness. Thus in Village of Euclid, Ohio v. Ambler

Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), the general validity of a zoning ordinance was considered at the behest of a property owner who alleged impairment of market values resulting from the existence of the ordinance "being enforced in accordance with its terms," 272 U.S. at 384, 47 S.Ct. at 117. That principle is not properly extended to the case at bar, where the restriction of land use results not from the present terms of the regulation, but from a fear that the present terms may be modified.

■ Even more tenuous than the position of the individual appellants is that of the State of Arizona, which argues that the present and likely future actions of the Secretary have cast a cloud on the State's title to lands in the Mineral Strip. A cloud on that title there may be, but not as a result of the Secretary's order assailed in this action. The State was seeking to enjoin and declare illegal action affecting whatever lands it does in fact own. It did not show that the Secretary challenges Arizona's title to any lands. It appears that the underlying legal questions troubling Arizona neither arise from the Secretary's order nor would be resolved by a judicial ruling as to the validity of that order.[17]

ing land." He testified that in his opinion the publicly announced position of the Secretary (presumably implied from the Solicitor's opinion), of the Department's right to restore the lands to the Indians, depreciated the value of the Taylor Grazing ranching privilege, and specifically reduced the fair market value of his ranch operation ($200,000, exclusive of cattle) by some 60%. On cross-examination he stated that the reduction resulted from the Tribe's request for restoration. For present purposes we take his testimony most favorable to appellants' case, as referring to the entire situation, including the Department's legal position, which he called a "cloud." He also testified that the cloud deterred investment in fences, tanks and trails, etc., necessary to conduct an efficient ranching operation.

It is unnecessary to consider the District Court's position that the testimony of impairment of value was insufficient

because unsupported by testimony of specific reductions in prices of offers, broker listings, etc. In our view the lack of ripeness was basic and would not have been cured by the addition of such factual evidence underlining decline in market values of ranches based on grazing permits. Even assuming a serious and definite current decline in market value, it results not from any decision made by the Secretary as to the action he intends to take, but from the fear that he will reach an unfavorable decision.

17. The problem of the nature and security of the State's title to Mineral Strip lands conveyed to it has existed since the passage of the Enabling Act, *supra* note 5. The problem is one of interpreting the cession to Arizona in the light of the Act of 1896, *supra* note 1, which provided that lands ceded by the Indians should be disposed of "under the provisions of the mineral-land laws only." In 1941 the

Appellants may pursue remedies with Congress to set at rest even niggling doubts. But whereas a legislature may act to prevent a controversy from arising, a court may act only when a case or controversy has arisen and is ripe for decision. We hold that the appellants in this case have not shown injury from any action taken or threatened by the appellees that warrants judicial consideration of the dispute concerning the Secretary's legal authority.

Affirmed.

Arizona Legislature, in a memorial addressed to Congress, spoke of "confusing and conflicting claims" to Mineral Strip lands. See 87 CONG.REC. A1377 (1941).