**UNITED STATES of America,
Plaintiff,**

v.

**CERTAIN PARCELS OF LAND IN SAN
BERNARDINO COUNTY, etc.,
et al., Defendants.**

Civ. No. 3129.

United States District Court
C. D. California.

Feb. 25, 1969.

Wm. Matthew Byrne, Jr., U. S. Atty., Ernestine Tolin, Asst. U. S. Atty., Los Angeles, Cal., for United States.

King, Eyherabide, Owen & Anspach, Bakersfield, Cal., for defendants.

## MEMORANDUM

HALL, District Judge.

The original Complaint in this case was filed September 2, 1943 at the height of the then existing World War. It sought to condemn more than 300,000 acres of land by what is commonly called a "perimeter" description. At that time the lands were sorely needed for national defense purposes and there was not time to check out a title report to find the private ownerships within the perimeter.

The Complaint has since been amended fourteen times, and the matter before the Court now involves what is hoped to be the last of the compensable properties contained within that perimeter. This Memorandum does not deal with Parcel 44 which is fee land.

The instant matter concerns four motions made by the Government, plaintiff in this case, the burden of which is to exclude all evidence of any value of grazing leases issued under the Taylor Grazing Act, Title 43 U.S.C. § 315m. Such grazing *leases* are held by the Eyherabide family and their associates, and cover a large number of acres. The Government contends that these are terminable at will and thus do not constitute a compensable property interest; and cites in support of its position the following cases: Osborne v. United States (9 Cir., 1944), 145 F.2d 892; United States v. Cox (10 Cir., 1951), 190 F.2d 293, 296, cert. den. 342 U.S. 867, 72 S.Ct. 107, 96 L.Ed. 652; Bowman v. Udall (D.C., 1965), 243 F.Supp. 672,

aff'd Hinton v. Udall, 124 U.S.App.D.C. 283, 364 F.2d 676, cert. den. Hinton v. United States, 385 U.S. 878, 87 S.Ct. 159, 17 L.Ed.2d 105; Acton v. United States (9 Cir., 1968), 401 F.2d 896.

Both the *Osborne* case and the *Cox* case involved grazing *permits* issued under 43 U.S.C. § 315b of the Act, and the *Acton* case involved a *permit* which, according to the decision, was preliminary in nature under the Atomic Energy Commission Act.

The *Acton* case recognizes the distinction between *permits* and *leases* in the following language:

"Shortly after issue, the Commander of the Yuma Test Station, under the provisions of the reservation, terminated the prospecting permits. Thus, the uranium prospecting permits never reached maturity by the Atomic Energy Commission's issuance of preferential right leases, as normally would have occurred in the absence of such revocation. No compensation has ever been paid appellants."

The *Bowman* case involved an order of the Secretary of the Interior restoring subsurface lands for mining purposes to Indian tribal ownership, and the District Court held that surface rights whether by grazing permits or leases or otherwise were not affected by the restoration of the mineral rights to the Indians. The statement in the case to the effect that leases granted under 43 U.S.C. § 315m is a mere privilege which can be withdrawn by the United States without payment or compensation at any time is pure dicta and it relies upon the *Osborne* case and the *Cox* case, both of which as pointed out, were concerned with *grazing permits* under 315b. The Court of Appeals for the District of Columbia Circuit affirmed the District Court's opinion in Hinton v. Udall, 364 F.2d 676, but did not go so far as the District Court did in any statement concerning grazing permits or leases as indeed it was not necessary to do so.

The Taylor Grazing Act recognizes *two* kinds of rights for grazing purposes on public lands. 315b of 43 U.S.C. authorizes the Secretary to issue *permits* to graze livestock after establishing grazing districts. Throughout that whole section reference is made only to *permits*, and the section concludes with the statement that "*the issuance of a permit pursuant to the provisions of this chapter shall not create any right, title, interest, or estate in and to the lands.*"

The grazing *leases* involved in the instant case, on the other hand, are issued under the terms and provisions of Sec. 315m of 43 U.S.C. which authorizes the issuance of grazing *leases* to isolated or disconnected tracts which have not been placed in a grazing district *and has no such provision as the last above quoted one contained in the last sentence of Sec. 315b.*

Quite evidently Congress recognized that there was, and was to be, a distinction between leases, licenses and permits because there is a provision in the last part of Sec. 315m as follows:

"That when public lands are restored from a withdrawal, the Secretary may grant an appropriate preference right for a grazing *lease, license,* or *permit* to users of the land for grazing purposes under authority of the agency which had jurisdiction over the lands immediately prior to the time of their restoration."

I do not see how any language can be plainer that a *lease* was to be something *different* from a *license* or a *permit.* Had Congress desired the same restriction contained in the last sentence of 315b to be applicable to grazing *leases,* it could have merely added the words "leases" and "license" to the first sentence of Sec. 315b.

Two other things convince the Court that the grazing leases issued hereunder are property and the holder thereof has a compensable interest in this condemnation proceeding.

The first thing is a reference to the Complaint originally filed on September 2, 1943, when it recited that the Govern-

ment was condemning the "exclusive use of said lands together with all existing private rights in and to the lands of public domain included within the area arising out of *grazing leases,* mineral patents and otherwise." Prior thereto Honorable Abe Fortas, then Assistant Secretary of the Interior, addressed a letter to the Secretary of the Navy wherein he referred to the fact that the condemnation proceedings embraced grazing leases and stated: *"These leases are contracts and are not revocable at will."*

The second thing which convinces the Court that these are compensable and that the Government has, up to now, always regarded them as compensable is the fact that prior to the filing of the fourteenth amended Complaint, Eyherabide and Recatune gave an option to the United States to purchase the rights in their grazing leases in a section and a half (approximately 970 acres) for the sum of $750, which option the United States exercised on the 18th of `April, 1955, and paid Eyherabide and Recatune $750 for the approximately 970 acres of grazing leases.

The Court has concluded and indicated to the record at the conclusion of the argument yesterday that the Court would adhere to its previous holding that the grazing leases were property and were compensable.

The Government next argues that under the terms of the grazing leases the Government could "reduce" the acreage at any time, i. e., "reduce" it to zero acres. Three or more of such reductions occurred before the final termination of the grazing leases which occurred in 1958 (the respondents are claiming compensation for the value of the grazing leases on an annual basis from 1952 to the date of their termination in 1958), and for each reduction a compensation was given or allowed lessees. When it came to taking all of the land covered by the grazing leases, and thus reducing the acreage to zero, instead of following the procedure which they had previously followed which requires the Government to compensate such termination in one form or another, the United States filed the condemnation proceeding and did not follow the terms of the contract.

All of the motions of the Government to exclude any evidence of the value of the grazing leases are denied.