**DON'T TEAR IT DOWN, INC., et al., Plaintiffs,**

**v.**

**GENERAL SERVICES ADMINISTRATION et al., Defendants.**

**Civ. A. No. 74–381.**

United States District Court, District of Columbia.

April 23, 1975.

Thomas D. Nurmi, Patrick F. J. Macrory, David Bonderman, Washington, D. C., for plaintiffs.

Robert Werdig, Asst. U. S. Atty., Washington, D. C., for defendants.

---

1. 80 Stat. 915, 16 U.S.C. § 470f (1970).
2. *Id.*
3. 36 Fed.Reg. 8921 (May 13, 1971).
4. The Executive Order also requires an agency head to refer any questionable actions to the Secretary of the Interior for an

**MEMORANDUM–ORDER**

GASCH, District Judge.

This case is before the Court on defendants' motion to dismiss on grounds of mootness. The Court thinks it well to set forth the facts and circumstances giving rise to the present posture of the case.

### I. *Legal Background.*

The National Historic Preservation Act of 1966 [1] provides that any Federal project shall be begun only after taking into account the effect of such project on any property, site, structure or object which is listed on the National Register of Historic Places. The statute also provides that the Advisory Council on Historic Preservation shall be afforded the opportunity of commenting on such projects.[2] Executive Order No. 11593 [3] also provides that the Advisory Council shall have an opportunity to comment on such a project.[4]

The Advisory Council on Historic Preservation ("Council") has promulgated regulations setting forth the procedures for obtaining its comments. In general these regulations provide that the agency in charge of a proposed project must determine whether the project will affect a Register property. If such agency finds that the project adversely affects a Register property (or if the Director of the Council timely objects to a determination of no adverse effect), an elaborate consultation process must be complied with. This process includes an on-site inspection by agency head and Council Director, a meeting on the matter open to the public, and an opportunity for the Council to suggest alternative plans.

opinion regarding the property's *eligibility* for inclusion on the Register. *Id.* Where the Secretary of the Intreior determines that the property should go on the Register, the referring agency must reconsider the entire project in light of this classification. *Id.*

## II. *Facts.*

This case began, ironically enough, on Constitution Day of 1973.[5] On that day the General Services Administration (GSA) advised the Council that it intended to construct a new building for the Federal Home Loan Bank Board (FHLBB) in the 1700 block of G Street, N. W., in Washington, D. C.

The buildings in question here are four. The first of these is the Winder Building, built in 1857,[6] which was the site of part of the War Department during the Civil War and from which the search for the Lincoln conspirators was directed. The Winder Building was listed on the Register. The second was the Winder Annex which was, as its name implies, an integral part of the Winder Building. Third was the Riggs Bank Building, erected in the 1920's, whose imposing facade was regarded as an excellent example of the architecture of those days. Finally, there was the building occupied by the Nichols Cafe, a fine Federal townhouse from the early 19th Century (one of the few specimens of that style in the downtown area). In its letter of September 17, 1973, GSA stated that it would "determine the relationship" of the new building to the old ones.[7] Since it is a well-known physical law that two objects cannot occupy a given space simultaneously, the "relationship" in question would appear to have been clearly adversary.

On January 7, 1974, another communication issued from GSA to the Council. GSA found that the new building would have something of a detrimental effect on the Riggs Bank Building (total demolition) but that the Winder Building would be positively affected. The "positive effect" would be encirclement of the Winder Building by the FHLBB edifice. On January 31, 1974, it entered a contract for the demolition of the various buildings concerned.[8]

On February 5, 1974, the Council wrote GSA concerning the Riggs Bank Building, the Winder Annex and the Nichols Cafe, pointing out that all three buildings might be eligible for inclusion on the Register (and thus bringing into play the provisions of Executive Order No. 11593, *supra*). GSA adopted the useful expedient of ignoring this letter. On February 8, 1974, therefore, the Council sent a telecon message to GSA which reiterated the views expressed in the letter of February 5. The telecon also pointed out that the contract of January 31, 1974, appeared to be a clear violation of the law. GSA ignored this message also.

Undeterred, the Council then communicated the entire problem to an appropriate official of the Department of the Interior and itself requested Interior to determine the eligibility of the three buildings for inclusion on the Register. On the next day (February 14, 1974) the Council informed GSA of its action —again without response. On February 20, 1974, Interior determined that the buildings were eligible for the Register and so informed GSA and the Council. On February 22, 1974, the Council itself informed GSA of the decision by Interior and stated that the Council looked forward to the undertaking of the legally required procedures of consultation.

On February 27, 1974, GSA did respond. By letter of that date it advised that it had re-evaluated its proposal in light of the determination by Interior and that it had decided to demolish the three buildings. This judgment was accomplished only seven days after notification of Interior's decision, thus showing how expeditiously the "Government's Housekeeping Agency" can weigh the

---

5. September 17, 1973.

6. It is one of the few pre-Civil War office buildings left here.

7. The letter, however, made no mention of the Winder Annex or the Nichols Cafe.

8. This appears to have been a clear violation of 16 U.S.C. § 470f, since the Council had had no reasonable opportunity to comment on the project before approval of the expenditure of funds.

most delicate of artistic and historical factors. GSA did, however, indicate its willingness to continue in the consultation process (leading to a decision which it had apparently already made). On the same day, GSA representatives met with those of the Council.

At that meeting, the Council informed GSA that there had been no acceptable agreement regarding minimization of adverse impact on the buildings in question. GSA apparently agreed that it would undertake no demolition of the buildings until after submission of the matter to a full Council meeting on May 1–2, 1974. This agreement was set forth in a letter from the Council to GSA, dated March 1, 1974.

Meanwhile, on February 26, 1974, an attorney for plaintiffs herein contacted GSA and expressed plaintiffs' concern over the matter. Plaintiffs, through counsel, stated that they would file a law suit against GSA if the agency intended to continue demolition before completion of the consultation procedures. An official of GSA advised plaintiffs' counsel that GSA would not demolish the buildings until completion of the consultation procedures. Ominously, however, a news release on March 1, 1974, from GSA, stated that the agency would continue to clear the site in question.

On March 1, 1974, then, there was some confusion regarding the position of GSA. On Sunday, March 3, 1974, uncertainty terminated. GSA clarified the issue by execution of a classic Sunday sneak attack. It sent in the wreckers.[9]

Before any action could be taken, the Nichols Cafe was obliterated, the Riggs Bank demolished (save only for its facade) and the Annex roof pierced. On Monday, March 4, 1974, this Court granted a temporary restraining order to halt demolition until the Court could act on the question of a preliminary injunction.[10]

There followed a number of orders,[11] the intent of which was to give the parties an opportunity to comply with the relevant consultation procedures. The result was that a special meeting of the Advisory Council was set for April 2 and 3, 1974. The first day's meeting was to be a public session while the second day's was to be an executive session, closed to the public. This scheme, of course, would seem to violate the requirement that the meetings be public. 36 C.F.R. § 800(5)(c).

The first day's meeting went off without difficulty. On April 3, 1974, Mr. Sampson expressed his view that the Council staff members were misleading and misusing the Council to gain their own objectives.[12] Sampson warned that these machinations by the staff were undermining the Council's credibility and "clout."[13] He stated that he had previously consulted with persons (on various official bodies) who had far more expertise than the Council staff and these persons had agreed with the GSA decision.[14] Sampson then continued:

> At this point you may wonder why I did not attempt to call a meeting of the Council, or meet with Council

9. Mr. Sampson, Administrator of GSA, has stated elsewhere that demolition actually began on Friday, March 1, 1974. *See* Statement by Mr. A. F. Sampson before the Advisory Council on Historic Preservation on April 3, 1974 (copy on file in this case). It is a well-known principle, however, that a plaintiff's allegations must be taken as true for purposes of a motion to dismiss.

10. The temporary restraining order halted demolition until the case could be heard on March 12, 1974. It was later extended to March 13. On March 14, 1974, pursuant to the consent of all parties, the Court entered

an order terminating all work (other than clearing rubble and the like) on the site until a hearing on the motion for a preliminary injunction which was set for March 23, 1974. On March 20, 1974, a similar consent order was entered providing that GSA would undertake no further work (with some exceptions) without giving five days notice thereof.

11. *See supra*, note 10.

12. *See supra*, note 9.

13. *Id.*

14. *Id.*

staff, or Secretary Morton, or somebody—before ordering demolition.[15]

Indeed, the Court itself has often so wondered. It need not have done so. The answer, said Mr. Sampson, was "simple." It was the staff again. The staff, according to Sampson, was intransigent, inflexible and had "the power to control and/or influence the Council."[16] Further consultation, thought Sampson, would be futile. The legal requirements were thus not deemed necessary and demolition began. The "simple" explanation, then, reduced itself to a statement that Sampson believed that the Council (of which he was a member) was under the misguided tutelage of its own staff and the staff would never agree with Sampson's views. Therefore, further consultation was vain and would not be carried on despite the legal mandates. In other words, Mr. Sampson was the dealer and the game was dealer's choice.

While perhaps not expressed with the purity of a classical syllogism, this logic was probably not without effect. In any event, the Council issued its comments on the next day, April 4, 1974.[17] To the astonishment of all defendants, the plaintiffs were not happy with this exercise in participatory decision making. On April 9, 1974, plaintiffs returned to Court seeking leave to amend their complaint. On April 11, 1974, they sought another temporary restraining order and a preliminary injunction, pointing out the fact that the Council meeting was not in accord with law.[18] The defendants serenely filed a motion to dismiss on the ground that they had now done all that was required. Despite this eloquent argument, the Court granted the restraining order (April 11, 1974).

Also on April 11, 1974, the Court ordered the defendants to produce any tapes or transcripts which might exist of the April 3, 1974, Council meeting. Concerned that the Court had departed the path of right reason and was unduly concerned over trivial matters, defendants (on April 16, 1974) moved the Court to reconsider. The Court denied this on the same day. This led to the revelation of Sampson's speech to the Council.

The Court then extended the restraining order by subsequent order (April 23, 1974) and by approved stipulation (April 26, 1974). Except for two orders permitting some necessary work to be done on the site, matters remained at rest until July 19, 1974, at which time the Court dissolved the restraining order but enjoined any work which would affect the integrity of the Riggs building until such time as the removal thereof had been agreed to by the Joint Committee on Landmarks, the Commission on Fine Arts and the National Capital Planning Commission.

The matter is now again before the Court on motion to dismiss. The agencies concerned have gone to great pains to revise the construction plans to save, where possible, the remaining buildings. The record now reflects GSA's regret for the precipitousness of its prior actions and acknowledges GSA's responsibilities, under the Historic Preservation Act, to consult with the Advisory Council. It notes the recent efforts of defendants to comply with the law. The case, say defendants, is moot.

### CONCLUSIONS

A nation is an entity in many senses beside the political. Shared beliefs and experiences provide the flesh and sinew

15. *Id.*

16. *Id.*

17. The Council thus bettered GSA's own reaction time in the delicate judgmental task involved here. It may be that this was due to the Council's greater experience and ex-

pertise herein. It may be also that the Council's ability to call on one of its members, Mr. Sampson, who had also figured largely in GSA's decisions, speeded its deliberations.

18. GSA had given notice that it intended to resume demolition.

which cover and unite the bones of political organization. These common beliefs and experiences are nourished, sustained and, indeed, sometimes created by history. Historical knowledge, then, is the life's blood of a people. To cut it off is to assure the eventual disintegration of the political entity. Congress has wisely recognized this and has provided, in the statutes here involved, for a careful consideration of historical values before a project which may destroy those values is begun.

This is not to say, of course, that contemporary needs should be utterly subordinated to the remnants of the past. That would indeed be to crush the present under the detritus of antiquity. All that is required is that the Government agency concerned take into consideration the historical values which may be affected by any planned project. The Congress has provided a procedure whereby this may be done. The situation is not dissimilar to that existing under .the National Environmental Policy Act of 1969, except that the values protected here are less tangible, if no less valuable, than environmental values.

It seems clear to the Court that the actions of GSA through April 3, 1974, were in contravention of the policies and procedures mandated by Congress. Since that time, GSA has conformed to the law, although such conformity may well have been dictated more by concern for this Court's coercive powers than by any general respect for law. It is not, therefore, without some hesitation—and even trepidation—that the Court concludes that this case is moot and must be dismissed.

The plaintiffs sought an injunction prohibiting work until compliance with the consultation process, an injunction prohibiting Mr. Sampson from sitting on the Council on this matter, a declaratory judgment that GSA acted unlawfully herein and an injunction ordering GSA to comply, in the future, with the National Historic Preservation Act. All requisite permissions were obtained. It is undisputed that Mr. Sampson played no significant part in the Council's deliberations. There is no further need for a declaratory judgment. So far as the Court is aware, the conduct of GSA, although redolent of the "age of absolutism," has not been duplicated in any other instance relating to historic preservation. That it will be duplicated must be deemed speculative. GSA does not dispute the impropriety of its conduct, and, indeed, apologizes for it. The case is moot. *See O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1974); *United States v. W. T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *Hinton v. Udall*, 124 U.S.App. D.C. 283, 364 F.2d 676 (1966); *Brandenfels v. Day*, 114 U.S.App.D.C. 374, 316 F.2d 375 (1963).

Accordingly, it is by the Court this 23rd day of April, 1975,

Ordered that the motion of defendants to dismiss this action be, and the same hereby is, granted and the said action is dismissed.